**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | No. 1:24-cr-000111-SE |
| | ] | |
| ARTHUR PICANCO | ] | |
| | ] | |

<u>**SENTENCING MEMORANDUM**</u>

The defendant, Arthur Picanco, by and through counsel, Eric Wolpin, hereby files this sentencing memorandum respectfully requesting that the Court sentence him to a sentence of 84 months (seven years) imprisonment followed by five years of supervised release. The Supreme Court, in *Pepper v. United States*, emphasized the principle underpinning federal sentencing that "the punishment should fit the offender and not merely the crime." 562 U.S. 476, 487-88 (2011) (internal quotations omitted). As outlined herein, the defendant's proposed sentence considers Arthur's significant mitigating personal history and the aberrant nature of his conduct, falls within the Fed. R. Crim. P. 11(c)(1)(C)-stipulated range, exceeds the high end of the applicable guidelines, and is no greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

In support thereof, the defendant submits the following:

## I.      Introduction

Arthur served his country in wartime abroad, has no past criminal conviction history, and lacks any indicators of sexual interest in children (i.e. child pornography, chats with minors, pedophilic online search terms, etc.). He has a strong work ethic, struggles with lingering PTSD arising from his service in the Air Force, and has actively engaged in sex-offense specific counseling while on pretrial supervision. In late 2024, Arthur sought transactional sex online with an adult through an adult website advertisement. The advertisement to which he responded was designed and taken out by law enforcement and did not indicate the involvement of a minor. Upon responding to the advertisement, an undercover officer presented herself to Arthur

as a former prostitute advertising her minor children for sex. Arthur repeatedly asked to have sex with the officer, an adult, but she declined. Arthur ultimately traveled to a hotel provided by the undercover officer and pled guilty to crossing state lines to have illicit sex with a minor. Within a month of this event, Arthur began counseling where he has exhibited, according to his counselors, a "full commitment to the therapeutic process," "significant remorse and insight," and a "dedication to change and [] desire to live responsibly." Exhibit A, *Letter from Nicole Provencher*, *Associate Clinician*, Oct. 1, 2025; Exhibit B, *Letter from Nancy DiZio*, *Associate Clinical Director*, Oct. 15, 2025. Arthur is before the court on a plea agreement providing a sentencing range of seven to ten years in federal prison. For the myriad of reasons set forth below, a sentence of seven years in prison followed by five years on supervised releases is no greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## II.    18 U.S.C. 3553(a), Arthur's personal history and circumstances: Arthur is an Air Force veteran who served in the Iraq War, witnessed violence, and suffers with service-related trauma.

*"Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines[.]"*

United States Supreme Court

*Porter v. McCollum*, 558 U.S. 30, 43 (2009).

### A.    Introduction and Arthur's childhood.

Arthur is in his early forties. He was born and raised in Peabody, Massachusetts in an immigrant family. Arthur is an American citizen. Arthur grew up with his mother, father, and siblings. Neither of his parents completed high school. Arthur's was a lower-middle income family where, although his basic needs were consistently met, family members were emotionally distant and corporal punishment was common. Arthur's father labored as a carpenter until he became disabled; he died last month after a multiyear battle with cancer. Arthur's mother works the night shift as a cleaner. While on pretrial release, Arthur and his mother shared the responsibility of getting his ailing father to medical appointments and taking care of

his basic needs. The last few weeks have been emotionally challenging as Arthur faces the loss of his father and his pending incarceration.

## B. Following high school, Arthur joined the military to serve his country after 9/11.

In high school, Arthur's education focused on vocational training. "Slow" to learn academic subjects, Arthur was quick to pick up the skills of automotive repair. After graduating from high school in 2002, Arthur repaired damaged cars at a local auto repair shop. Unfulfilled by his job and profoundly affected by the tragedy our nation suffered on September 11th, Arthur joined the United States Air Force in 2004. He hoped to use his skills to serve his country and see a larger world. He served in the Air Force for the following eight years. Arthur's military service remains the proudest accomplishment of his life.

The Air Force utilized Arthur's mechanical and machinery skills over numerous overseas tours. He trained in areas like "pavements maintenance" and "construction equipment opera[tions.]"[1] He specialized in operating heavy equipment and built and maintained essential military infrastructure. Arthur was a jack-of-all-trades, maintaining the paved airfield in a manner that "greatly reduced potential aircraft damages," and "refurbish[ing]" a headquarters "conference room" "sav[ing]" the military "$535k versus contractor costs." In the mid 2000's, Arthur was deployed to the Manas Air Base (Kyrgyzstan) in support of our country's Afghanistan mission. The Manas Air Base was a primary air mobility hub for coalition military forces operating in Afghanistan. Around-the-clock missions on base included aerial refueling, airlifts, and airdrops.[2] Arthur's work on base was crucial to the operation of military efforts and missions. At the base, he identified "pavement defects," laid

---

[1] The quotations provided in these sections are from Arthur's Air Force personnel records. Additional details from these records can be found in paragraph 58 of the presentence report.

[2] *See* Maj Damien Pickart, Air Force, *Kyrgyz government finalizes decision to close Manas*, Feb. 20, 2009 *available at* https://www.af.mil/News/Article-Display/Article/121110/kyrgyz-government-finalizes-decision-to-close-manas/ (For seven years, "Manas A[ir]B[ase] has served as the premier air mobility hub for the International Security Assistance Force and coalition military forces operating in Afghanistan. The around-the-clock missions include aerial refueling, airlift and airdrop, aeromedical evacuation and support for coalition personnel and cargo transiting in and out of Afghanistan.").

down "30 tons of hot asphalt mix—reduc[ing] traffic hazards by 35%," and "finished [a] 7 cubic meter concrete monument [to] honor fallen hero's [sic]." Additionally, he trained other servicemen, "provid[ing] 23 members training on dump-truck operation." Although a hot bed of military activity, Arthur's role within the Manas Air Base provided some separation from the actual fighting.

Later that decade, Arthur served multiple tours in Iraq. Unlike his comparatively safe experience in Kyrgyzstan, these deployments in Iraq placed him in the middle of active combat. Arthur was deployed to Joint Base Balad, also known as "Mortaritaville," a darkly comic reference to the Jimmy Buffet song that reflected the base's constant bombardment by mortars.[3] Arthur continued in his supportive role, where he "led six [airmen] for airfield repairs at Balad, AB, Iraq; replaced 500 defects on the runway—safeguarded $30B[illion] in A[ir] F[orce] assets." While on base, he offered not just his skills, but also his body, "donat[ing] platelets/blood four times [and] aid[ing] DOD's busiest hospital in life-saving operations." Although not actively fighting while in Iraq, the sights, sounds, smells, fears, and consequences of war were part of Arthur's daily life.

### C. Early efforts at mental health counseling.

While in the military, Arthur sought out counseling but quickly retreated from help after a single session. In 2021, Arthur sought out mental health services through the Department of Veterans Affairs ("VA").[4] He married, but after only a few years, the marriage was failing. He described to the VA-therapist that he "always had great difficulty even dating back to childhood of socializing," and that he "prefer[ed] to stay

---

[3] *See* Air Force, Sr. Airman Chuck Broadway, Nov. 14, 2011, *available at* https://www.af.mil/News/Article-Display/Article/112122/jb-balad-wraps-up-operations/ (During the course of the U.S. operations in Iraq, J[oint] B[ase] Balad provided top cover for U.S. and coalition forces. F-16 Fighting Falcons, C-130 Hercules, MC-12 Liberties, HH-60 rescue helicopters and MQ-1B Predator remotely piloted vehicles all once called J[oint] B[ase] Balad home. It was the second largest installation in Iraq and housed the Air Force Theater Hospital."); *Chris Hamilton*, Mortar attacks part of daily life at Balad air base, Duluth News Tribune, March 27, 2007, *available at* https://www.duluthnewstribune.com/news/mortar-attacks-part-of-daily-life-at-balad-air-base (describing daily mortar attacks on the base and the experience of service men and women). Arthur's memories of his tim at Joint Base Balad are consistent with the press's descriptions.

[4] The quotations provided in these sections are from Arthur's VA medical records. Additional details from these records can be found in paragraphs 50-51 of the presentence report.

in." Arthur's marriage soon after fell apart, and Arthur left counseling. In the years that followed, Arthur worked a full-time union job and maximized available overtime to stay occupied. He felt alone. When interacting with others, he told the VA-therapist, "I don't know what to say." Somber, isolated, and lonely, Arthur sought short-term companionship and connection online through adult websites. His use of those sites led to this arrest.

### D.    Arthur's military service has had lasting consequences as he manages his posttraumatic stress disorder (PTSD).

Arthur repeatedly placed himself in harm's way during wartime to aid his country. For that, he has paid a significant psychological and emotional price. While in Iraq, a fellow airman and friend was struck and killed. This was not a quiet passing, but a fatal, body-destroying, violent death. Arthur's close experience with death and the lingering memories of frightening experiences in Iraq reverberate into the present. In 2025, the VA formally diagnosed Arthur with chronic post-traumatic stress disorder ("PTSD"). The VA therapist explained that Arthur "has experienced traumatic events" and presently "experiences intrusive symptoms, avoidance behaviors, [and] negative alterations in cognition and mood," among other trauma-symptoms. The therapist noted that Arthur attempted to "manag[e] these symptoms on his own for years," with limited success. The therapist concluded that Arthur's "anxiety and depression symptoms can be better explained by the trauma that [he] experienced," during his time in the service. The VA has determined that Arthur is 70% disabled due to his PTSD.

Since this diagnosis, Arthur has been prescribed medication through the VA to manage his PTSD symptoms. This pharmacological assistance has been extremely helpful. Arthur initially met bi-weekly with a therapist at the VA. He maintained that for a time while also engaging in private counseling. He ultimately felt the private counseling—described in the attached letters—was a better fit and has been attending counseling continually since his arrest.

### E.    Arthur's work ethic and consistent employment.

In 2012, after leaving the military, Arthur took a series of jobs operating large equipment. He has always worked. In 2016, Arthur obtained a job maintaining train tracks in and around Boston. He kept a "hoisting engineer license" from the Massachusetts Office of Public Safety and Inspection, which allowed him to use heavy cranes to complete the work. Arthur progressed in his job until he made a six-figure salary. He held that job until his arrest. Immediately after his arrest, Arthur was fired. His job required no interactions with children or online contact with customers, yet the stigma of the indictment ended his career. While on pretrial release, Arthur worked for a home improvement center for a fraction of his previous salary. That job too, ended when he was fired due to this offense. Arthur is a hard worker. He is reliable. He is peaceful. He lost his job of eight years. Imprisonment is the most obvious of the harsh consequences that flow from this conviction, but the scarlet letter of registration and unemployability will follow him for the rest of his life.

### F.    Arthur does not present as a high risk to reoffend.

While on pretrial release Arthur underwent a psychosexual evaluation, with Dr. Charles Samenow, a board-certified psychiatrist, Associate Clinical Professor of Psychiatry and Behavioral Sciences at George Washington University's School of Medicine and clinical practitioner specializing in sexual disorders and addictions. *Case Review and Psychosexual Evaluation*, Sealed Exhibit C. In furtherance of a psychosexual report, Dr. Samenow reviewed Arthur's medical records and case discovery, conducted clinical interviews with Arthur, spoke with a family member, and administered a series of tests. Dr. Samenow describes a person suffering with persistent depression and social anxiety, with his anxiety "likely originat[ing] from his challenging childhood and military trauma." *Id.* at 13. In layman's term, Dr. Samenow sets forth a picture of Arthur as an intensely lonely person whose social difficulties have kept him from attaining interpersonal intimacy. Adapting to that reality, Arthur gravitated to impersonal sexual experiences that allowed him "to avoid intimacy and vulnerability due to his poor self-concept and his negative dating experiences." *Id.* at 15.

Looking further into Arthur's sexual profile, Dr. Samenow administered a series of assessments intended to identify those with pedophilic disorders. *Id.* at 10-12. Dr. Samenow concluded that Arthur's did not have a "statistically significant interest in prepubescent males or females," and that he fits a "profile [that] is considered normal for a heterosexual male of his age." Considering Arthur's test results and other information known to him, *i.e.* the absence of child pornography on Arthur's phone, Dr. Samenow opined that Arthur "does not meet the criteria for pedophilic disorder." *Id.* at 12.

Dr. Samenow further examined Arthur's risk for recidivism using a host of tools. These tests produced results in the low to average range for risk of recidivism. *See e.g.*, *Id.* at 16 (Arthur's profile indicates someone who is at "low risk" of recidivism); *Id.* at 17 (Static-2002R scores Arthur as "average risk" for recidivism); Id. *at* 17 (Risk Matrix 2000 scores place Arthur in the "low risk category"); *Id.* at 18 (BARR-2202R establishes Arthur as a "below average risk"). Incorporating these results, Dr. Samenow concluded that Arthur was at "average risk" for a future offense, *id.* at 19, but that with "treatment and supervision, his risk is likely to fall to below average." *Id.* at 21. Importantly, as noted in Dr. Samenow's report, Arthur is "highly amenable to treatment," an opinion he grounded in Arthur's pretrial engagement with treatment and his 'age-appropriate sexual interest that can be fostered in therapy." *See Id.* at 20 ("Mr. Picanco is motivated and willing to pursue treatment to address his sexual offense behavior. The records indicate that he has been participating since the time he was arrested, has been adherent to his treatment, and has made good progress."); *see also* Exh. A and Exh. B (same).

As Dr. Samenow discussed, overly harsh sentences for those in lower risk categories have the unintended effect of increasing the likelihood of recidivism and decreasing the effectiveness of treatment and supervision. Exh. C at 21. This is true as extended periods of incarceration delay treatment and weaken existing protective factors, thereby undermining the potential for positive outcomes. *Id.* at 20-22. Here, a sentence of seven years in prison is more than sufficient to address Arthur's

relatively low risk of recidivism while hopefully not undermining the rehabilitative path he took post-offense.

## III.    18 U.S.C. 3553(a), Nature and Circumstances of the Offense.

Arthur has publicly admitted his guilt and has accepted the heavy weight of life-altering consequences—prison time, stigma, loss of employment, sex offender registration—that have already impacted his daily life. The presentence report details the sequence of events and choices that led to this charge. The defense does not contest these facts. What the defense highlights below regarding the nature and circumstances of the offense is the lack of a demonstrable interest in sexual contact with minors in every other part of Arthur's life and the relatively impulsive nature of the present charge.

The absence of a historical interest or action to this end is relevant to the court's sentencing decision. It is common, for example, for the court to see a case with a defendant caught selling drugs at a particular time, but evidence demonstrates that the defendant had done so for far longer. It is also common for the court to see a defendant who possesses child pornography on a particular day, but for there to be evidence that the crime was long-term and ongoing. That Arthur's offense came about in a single day, without any evident propensity or past exploration of similar conduct with minors, is a relevant aspect of the "nature and circumstances" of the offense. Arthur's lack of predilection is demonstrated by evidence found and not found in this case.

Here, law enforcement set up a "sting" operation in New Hampshire. The sting involved posting advertisements on local websites that advertise adult commercial sex. Trial Transcript, *United States v. Lancaster,* 1:24-cr-00110-PB-AJ, ECF No. 56 at 67 (testimony from lead investigative officer Draper agreeing that "the websites have rules that everyone needs to be 18-plus."); *Id.* at 71 (testifying that "more individuals" using these websites "are looking for a provider that's 18 or older."). Law enforcement posted its advertisement among other adult advertisements using language common to adult advertisements. *Id.* at 76 (testifying that the words law enforcement included in their advertisement were "common terms used" by actual

adult commercial sex providers). Law enforcement did not represent that the commercial sex provider being advertised was underage.

Arthur responded to the advertisement seeking sex with an adult. He was not looking to have sex with someone underage. Seeking paid sex with an adult is illegal, of course, but it differs in character and consequence from seeking sex with an underage teen. The undercover officer told Arthur that she was the mother of two minors and that the girls were in truth the subject of her advertisement. In a call with the undercover officer, Arthur asked whether the officer, clearly an adult, would have sex with him instead of the minors. She declined. In their conversations, the undercover vacillated between reminding Arthur that he didn't have to follow through with meeting an underage girl, ("if it's not your thing, that's cool"; "Like I said, there's a bunch of women out there my age, hon. Like, if that's what you're in to, like, there's a bunch of them out there.") while repeatedly reassuring him that having sex with an underage girl would not be "a big deal" ("I mean, like I said, shit, they're going to be fucking anyways so we may as well make some money off it.") ("Like I said, I mean, they're, ya know, gonna be screwin' anyways, so we may as well make money.") ("it's really *not a big deal* . . . it's not like I force them plus they love the $$") (emphasis added).[5] Someone actively seeking underage sex does not need these repeated reassurances as that person would already be on board; Arthur needed this coaxing and reassurance as it was a moral boundary he was struggling to cross.

Arthur's hesitation is evident throughout the interaction. After arriving at the hotel parking lot, police body-camera video captures Arthur again inquiring about sex with the adult undercover officer and explaining that what he really wanted was to have sex with her and not the minors. *See* PSR ¶ 14 (Arthur stating "How come you don't do it? I'd like to see you."). The officer declined, and Arthur was soon arrested. Upon his arrest, law enforcement immediately seized and later examined his phone. Given the sudden nature of his arrest and the seizure of his phone, Arthur had no opportunity to delete data or obscure his past online behavior. Significantly,

---

[5] These quotations are from the text exchange included in full in paragraph 12 of the presentence report and the recorded phone call described in paragraph 13 of the presentence report.

the phone contained no child pornography, no chats with young people online, no child pornography-related internet searches, nor any of the other digital hallmarks the court has seen among those with a sexual interest in children.

Arthur made a terrible decision in November 2024. He did not seek out the circumstances that presented themselves but, once they arose, he did not turn his back, and he moved forward. For that choice, he will pay an immense price.

## IV.    18 U.S.C. § 3553(a)(4): The sentencing guidelines.

The defense does not object to the guidelines as presented in the presentence report. Although the defense does not object to the application of USSG §2G1.3(b)(3)(B) for "use of computer," the Court should vary downward in its calculation of the offense level here as this enhancement is nearly ubiquitously applied and fails to differentiate culpability levels between defendants. *See* U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics, Guideline Calculation Based, Fiscal Year 2024* at 95[6] (USSG §2G1.3(b)(3)(A) and (B), pertaining to the use of computer was applied in 87 percent of guideline calculations under USSG §2G1.3); U.S. Sentencing Comm'n, *Report to Congress: Federal Child Pornography Offenses*, 2012, at iii[7] (. . . sentencing enhancements in §2G2.2 [including] those relating to computer usage . . . now apply to most offenders, and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders.").

The parties have, in the past, regularly jointly recommended a two-point downward variance in this district on this basis in child pornography cases. *See e.g.*, *United States v. Butler*, 1:21-cr-00202-PB, D.N.H., *Plea Agreement*, ECF No. 29, Sept. 7, 2022, at 7 (in a plea agreement to distribution of child pornography, the agreement notes that "in light of the 2-level enhancement for use of a computer under USSG

---

[6] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/Ch2_Guideline_FY24.pdf

[7] *Available* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

§2G2.2(b)(6), the parties will recommend a 2-level downward variance."); *United States v. Wilcox*, 1:22-cr-00047-JL, D.N.H., *Plea Agreement*, ECF No. 21, Dec. 20, 2022, at 7 (in a plea agreement to distribution and transportation of child pornography, "the United States also agrees to recommend under Rule 11(c)(1)(B) that the Court apply a 2-level downward variance to offset the 'use of computer' enhancement under U.S.S.G. § 2G2.2(b)(6)."). Where these cases relate to possession of child pornography, rather than traveling with the intent to engage in illicit sexual conduct, the rationale for these joint recommendations for a variance applies here.

Furthermore, Arthur used particularly unsophisticated tools on his "computer," a cell phone—sending text messages and making phone calls—to communicate with the undercover officer. He did not use the dark web, peer-to-peer networks, social media networks frequented by children, artificial intelligence, or any other aggravating "computer" programs in furtherance of this crime. Texting and calling are the most basic tools of modern communication, and their use does not support an increase in offense level. For that reason, a two-point downward variance is warranted and would produce a range of 46 months to 57 months. The defense's sentencing recommendation exceeds the high end of this variant guideline range.

## V.    18 U.S.C. § 3553(a)(6): Avoiding unwarranted sentencing disparities.

The relative severity of Arthur's actions align with his offense of conviction, 18 U.S.C. § 2343(b), the statute of conviction in past underage, New Hampshire sex sting operations. Looking at recent sentences under § 1591 (Count I of the indictment, to be dismissed at sentencing) and § 2343(b) (Count II, the offense of conviction) prior to this recent sting operation, the difference in punishments is stark. Pimping and exploiting children over an extended period of time leads to an extended prison sentence. Meeting an undercover officer after a short conversation online with no prior history of sexual activity with children supports a prison sentence, but not of comparable length.

### A.    18 U.S.C. § 1591 cases in the District of New Hampshire preceding this undercover sting operation.

Two recent District of New Hampshire cases preceding this sting operation

resulted in convictions for violating 18 U.S.C. § 1591. See Exhibit D. PACER Report (identifying United *States v. Murray*, 1:22-cr-00117-PB, and *United States v. Townsend*, 1:21-cr-00139-JL as recent DNH cases under 18 U.S.C. § 1591). Neither case bears a similarity to the offense conduct in this case.

### i.    *United States v. Murray*, 1:22-cr-00117-PB.

Mr. Murray, "[o]ver the course of at least six years . . . sexually exploited teenage boys under his supervision." *Gov't Sentencing Memo*, ECF No. 17 at 1. He "capitalized on the relationship he had so carefully cultivated [with subordinate minors] as well as his position of authority over his victims by subjecting them to months—and in some cases, years—of sexual abuse and exploitation." *Id.* at 2. For reasons that are obvious, Arthur's one-time decision, lack of planning, and absence of actual child victims is simply not comparable to Mr. Murray's actions. In *Murray*, the Court imposed a multi-decade sentence concurrent with sentences arising from related state court, hands-on sexual assault offenses.

### ii.    *United States v. Townsend*, 1:21-cr-00139-JL.

Mr. Townsend sexually assaulted a minor and served as her pimp. *Gov't Sentencing Memo*, ECF No. 45 at 2. Mr. Townsend "posted numerous advertisements featuring [the minor] on Backpage.com and facilitated commercial sex transactions between [the minor] and customers, to include negotiating prices, agreeing on terms, escorting her to meetings with customers, and collecting money from customers." *Id.* at 2. Mr. Townsend acted violently toward the minor and was a gang member. *Id.* at 2, 4. The government requested a sentence of 150 months imprisonment. *Id.* The Court imposed a sentence of 132 months, or eleven years in prison. *Judgment,* ECF No. 49. Mr. Townsend donned a repeated and deliberate managerial role in the sex trafficking of a child and was a hands-on offender against that child. Those offenses resulted in a sentence of 11 years of imprisonment; one year more than the government is requesting in this case. Townsend's conduct is not comparable to Arthur's, and the two defendants should not face equal or comparable punishments.

**B.     18 U.S.C. § 2423(b) cases in the District of New Hampshire preceding this undercover sting operation.**

Since 2019, our court has sentenced **four** defendants for violating 18 U.S.C. § 2423(b), Arthur's offense of conviction. *See* Exhibit E, PACER Report (identifying recent DNH, 18 U.S.C. § 2423(b) cases). Section 2423(b) criminalizes the defendant's crossing of state lines to have sex with a minor.[8] The recent sentences imposed in this court for violating 18 U.S.C. § 2423(b) provide important context as to what constitutes a fair and just sentence in this case. Of the four cases, two arose from a sex sting operation that, like here, involved an undercover officer and no actual minor. *United States v. Colantonio*, 1:20-cr-00051-LM; *United States v. Yazbek,* 1:19-cr-00037-LM. Two others involved an actual minor victim, where the defendant had sexual intercourse with the minor. *United States v. Couture,* 1:25-cr-00025-SE; *United States v. Hall,* 1:24-cr-00087-PB. Arthur's requested sentence more than doubles the sentences imposed on the two prior sting defendants, and exceeds the sentence of Messrs. Hall and Couture, who had sexual intercourse with a twelve- and fifteen-year-old respectively.

### i.     *United States v. Yazbek,* 1:19-cr-00037-LM.

In *Yazbek*, undercover officers posed as a fifteen-year-old girl online. ECF Doc. 18 at 1. The defendant, engaged in extended sexual communications "in explicit and graphic detail" with the purported minor. *Id.* After days of such conversation, Mr.

---

[8] The above focuses on violations of 18 U.S.C. § 2423(b), the statute subsection involved in this case. For completeness, the defense notes that the court sentenced two defendants for violating 18 U.S.C. § 2423(a), which criminalizes transporting the minor across state lines (rather than criminalizing the defendant's travel across state lines), during this time frame. Of note, section (a) triggers a ten-year mandatory sentence. In *United States v. Espinal,* 1:19-cr-00220-PB, the defendant repeatedly communicated with and shared sexual materials with a thirteen-year-old online. The defendant brought the minor from New Hampshire to Massachusetts and had sexual intercourse with her at his home. Mr. Espinal pled guilty to violating 18 U.S.C. § 2423(a). The Court sentenced him to the mandatory-minimum, 120-months imprisonment. Unlike the present case, Mr. Espinal involved an extended relationship with a real minor *and* the sexual abuse of that minor. In *United States v. Moore*, 1:24-cr-00083-JL, also a 18 U.S.C. § 2423(a), case, the defendant, a coach and teacher, groomed a minor student he supervised for months, transported her across state lines, plied her with alcohol, and "once she was so drunk that her vision was blurry and she felt numb, Moore raped her." *Gov't's Sentencing Memorandum*, ECF No. 39 at 2. The Court imposed a sentence of 121 months imprisonment. The government is requesting the Court impose an equivalent sentence in this case despite the lack of sexual contact and the absence of an extended period of grooming.

Yazbek traveled to New Hampshire with the intention of having sex with the minor; he brought presents and lubricants. *Id.* at 2. Mr. Yazbek pled guilty to violating 18 U.S.C. § 2423(b). At sentencing, the government requested a sentence of forty-six months, the defendant requested a time served sentence (although not explicitly noted, the docket report suggests this was the equivalent of one day), and the Court imposed a 24-month sentence of imprisonment followed by five years of supervision. *Id.*; ECF No. 19 at 1.

### ii.    *United States v. Colantonio*, 1:20-cr-00051-LM.

In *Colantonio*, an undercover officer created an online persona for a fourteen-year-old girl. *Plea Agreement*, ECF No. 2 at 3. For several days, the defendant had sexual conversations over social media with the purported child, including expressing an interest in having sexual intercourse with her. *Id.* Mr. Colantonio then drove from Massachusetts to New Hampshire for the purpose of meeting and having sex with the girl. *Id.* When he arrived to meet the girl, law enforcement officers arrested him. *Id.* Mr. Colantonio pled guilty to violating 18 U.S.C. § 2423(b), and the parties agreed to jointly recommend a thirty-three-month sentence of imprisonment per Fed. R. Crim. P. 11(c)(1)(C). *Id.* at 5. The Court accepted that agreement and sentenced Mr. Colantonio to serve thirty-three months in prison followed by five years of supervision.

### iii.    *United States v. Hall*, 1:24-cr-00087-PB.

In *Hall*, the defendant pled guilty to violating 18 U.S.C. § 2423(b). ECF No. 2 at 1. Mr. Hall met a twelve-year-old girl online. *Id.* at 3. The two had sexual conversations that included the sending of graphic photographs. *Id.* Mr. Hall traveled from New York to New Hampshire and returned the minor to his home in New York. *Id.* Mr. Hall had intercourse with the minor. As part of a Fed. R. Crim. P. 11(c)(1)(C) agreement, Mr. Hall pled guilty to violating 18 U.S.C. § 2423(b) and the parties agreed to recommend sentences ranging from 72 to 144 months imprisonment. *Id.* The Court imposed a sentence of 72 months in prison.

### iv.    *United States v. Couture*, 1:25-cr-00025-SE.

In *Couture*, the defendant pled guilty to violating 18 U.S.C. § 2423(b). *Plea Agreement*, April 10, 2025, ECF No. 23. Mr. Couture chatted online with a fifteen-year-old girl chatted online via a social media application. *Id.* at 2-3. Mr. Couture tattooed the minor, and "picked the Minor Victim up from her home in [another state] and they drove to a location where they engaged in sexual intercourse." *Id.* at 3. As part of a Fed. R. Crim. P. 11(c)(1)(C) agreement, Mr. Couture pled guilty to violating 18 U.S.C. § 2423(b) and the parties agreed to recommend a sentence of 51 months imprisonment. *Id.* The Court imposed a sentence of 51 months. *Judgment*, Sept. 15, 2025, ECF No. 33 at 2.

### C.    Avoiding unwarranted sentencing disparities.

The need for a sentence to avoid unwarranted disparities is codified in 18 U.S.C. § 3553(a)(6). In the above noted 18 U.S.C. § 1591 cases, the defendants engaged in a pattern of sexual misconduct that caused harm to minor victims. A decade or more in prison is justifiable when addressing deliberate and repeated sexual assault against minors. In contrast, offense conduct underlying recent section 2423(b) convictions that are more analogous to Arthur's offense have resulted in sentences below the sentencing recommendation made here. In the two 2423(b) cases where the minor was an undercover officer posing as a child in a sting operation, the defendants directly discussed sex with a purported minor for days before physically appearing and intending to have sex with the minor. Here, the offense conduct spanned one day and began with a response to an advertisement for adult sex. There is no indication that Arthur was trolling the internet for children, nor was there any child pornography on his phone or chats with minors that would indicate an interest in children. Arthur's repeated requests to the agent to have sex with the adult officer instead of the minors suggests a much less developed or at least less persistent intent to have sexual contact with minors than existed in both *Colantonio* and *Yazbek,* where the defendants communicated directly with a purported minor for days before committing to meet up. The government's recommendation for a 10-year sentence would be consistent with completed sexual assaults and trafficking in children rather

than responding to a sting and coordinating a one-time meeting. The defendant's proposed sentence better matches past sentencing practices in this court and avoids unwarranted sentencing disparities.

## VI.    18 U.S.C. § 3553(a)(2)

The directive to the Court, per the parsimony principle, is to establish a sentence that is sufficient, but *no greater than* necessary to meet the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2)(A)-(D). In other words, the court is tasked with imposing the lowest possible punishment that still meets the goals of sentencing. An above-guideline sentence of 84 months of imprisonment followed by five years of supervised release is sufficient but not greater than necessary to meet punitive, deterrent, community protection, and rehabilitative goals of sentencing.

### A.    18 U.S.C. § 3553(a)(2)(A): to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Section 3553(a) requires the Court impose a sentence under the parsimony principle that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). This case is serious and punishment is warranted. In the above section regarding comparable (and not comparable) circumstances, the Court has imposed prison time. The defense presents the Court with a sentencing option that includes nearly three-quarters of a decade in prison, years of supervision, and future registration as a sex offender. That punishment is severe and sufficient to reflect the seriousness of the offense. Although prison is the primary mechanism of punishment for this conduct, as discussed elsewhere in this memorandum, the consequences of this conviction extend into nearly every aspect of Arthur's life, limiting his employment prospects, social networks and companionship opportunities, and his reputation and privacy. As courts have recognized, the collateral consequences of a conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (district court's consideration of the "lasting effects of being required to

register as a sex offender" is an appropriate mitigating factor in sentencing); *United States v. Autery*, 555 F.3d 864, 875 (9th Cir. 2009) (under section titled, "Seriousness of the Offense, Respect for the Law, and Just Punishment," characterizing sex offender registration as "a punishment of lifelong significance (which can cause the listed person to become so socially ostracized that he has difficulty living in many communities)"). Those impacts are significant and severe and combined with seven years in prison and five years on supervision, satisfy the requirements of 18 U.S.C. § 3553(a)(2)(A).

### B.    18 U.S.C. § 3553(a)(2)(B): Adequate deterrence of criminal conduct.

Section 3553(a) requires the Court impose a sentence under the parsimony principle that "afford[s] adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As to specific deterrence, Arthur has been deterred from committing future crimes via the already formidable repercussions for his actions. He was fired from his job; he took a lesser job paying a fraction of his former salary (before losing that job); he was shunned by friends and social groups; he moved back home with his parents; he lived under home detention and/or a curfew for the past year; he is facing much of the next decade in federal prison; he will be subject to dozens of liberty restrictions for another half-decade upon release; he will have to register as a sex offender for life; he has caused himself reputational damage; he lives with shame for his behavior. The three additional years in prison recommended by the government is unnecessary for aims of specific deterrence.

As to general deterrence, the sentence recommended by the defense is sufficient to achieve those aims as well. To deter crime, there has to be crime to deter. It is unclear how prevalent the use of minors for commercial sex on adult escort webpages is in our area. Both agents testified in a companion trial that there were no elevated concerns about advertising children on adult escort websites in the Manchester area. *See* Trial Transcript, *United States v. Lancaster*, 1:24-cr-00110-PB-AJ, ECF No. 56 at 63 (the lead investigative officer, Draper, when asked if "law enforcement have information that . . . child trafficking in the sex trade was especially

problematic in the Manchester, New Hampshire area," responded that she "did not believe there was any specific intelligence that it was more prevalent here . . .."); ECF No. 58 at 134 (the case agent for this sting, Derek Dunn, responding under cross examination that he was "not aware of" a "special law enforcement concern" in Manchester with children being trafficked.). Similarly, the government's prosecution history does not suggest that trafficking of underage girls through adult, online escort sites in New Hampshire is common.[9] Far more common in this jurisdiction are adults with a sexual interest in children directly engaging with a minor in person or via social media applications in an effort to develop a sexual relationship.[10] General deterrence has its greatest value when there is a large number of potential violators to deter; such does not appear to be the case in these circumstances and the level of general deterrence that could be achieved among those perusing adult escort websites is unclear.

The Department of Justice's own publications present little confidence in the general deterrent value of sting operations:

> [O]f the 27 studies that used sting operations, half reported that the sting reduced the targeted crime, although even among those, the majority of reductions were short term. The remaining studies reported that the sting did not reduce the targeted crime. The most popular crime targeted by these studies was prostitution, where the majority of the seven studies

---

[9] Over the last decade-plus of NH-DOJ's online press releases, it appears that there have been two such charges brought in this district. *See* NH-DOJ Press Release*, United States v. Townsend*, Jan. 24, 2023, *https://www.justice.gov/usao-nh/pr/dover-man-sentenced-11-years-sex-trafficking-minor;* NH-DOJ Press Release, *United States v. Tucker*, June 25, 2021, *https://www.justice.gov/usao-nh/pr/new-hampshire-man-sentenced-21-years-prison-sex-trafficking-minor-and-other-crimes*. Although the defense acknowledges that there may be more such cases than are immediately apparent, the relative recent frequency of such cases does not compare to other kinds of sex and pornography cases adjudicated in this court.

[10] *See e.g., United States v. Moore*, https://www.justice.gov/usao-nh/pr/former-school-employee-sentenced-121-months-federal-prison-travel-intent-engage-illicit (The defendant, a "teacher and coach," "transported a child to a motel across state lines, supplied them with alcohol, and committed [sexual] assault."); *United States v. Hargraves,* May 22, 2025, https://www.justice.gov/usao-nh/pr/albany-man-arrested-posing-online-teenage-boy-obtain-child-sexual-abuse-material-minor; *United States v. Amodio,* May 19, 2025, https://www.justice.gov/usao-nh/pr/convicted-sex-offender-sentenced-violating-sex-offender-registration-requirements ("Within the chat room, Amodio began communicating with a purported 13-year-old girl."); *United States v. Hodgeman*, Nov. 6, 2024 ("In February 2023, https://www.justice.gov/usao-nh/pr/manchester-man-pleads-guilty-failure-register-sex-offender, ("Manchester police received a tip that an individual, later identified as Hodgeman, appeared to be exchanging sexually oriented chats online via Xbox with a 15-year-old child." )

reported no reduction in the targeted crime. Targeted crimes where stings appeared to be more effective were illegal sales of alcohol and traffic offenses.

Graeme R. Newman, *Sting Operations*, U.S. Dep't of Justice, Office of Community Oriented Policing Services, October 2007.[11] To the extent this method of policing reduces crime via a general deterrent effect, seven years in federal prison is sufficiently punitive to send that message to the broader community.

### C.    18 U.S.C. § 3553(a)(2)(C): Public Protection

Section 3553(a) requires the Court impose a sentence under the parsimony principle that "protects the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). As discussed above, Arthur presents a low risk of reoffending in a similar manner. He has already engaged in more than a year of offense-specific treatment. His participation in treatment has been stellar, including, according to his counselor, a "full commitment to the therapeutic process," "significant remorse and insight," and a "dedication to change." Exh. A; Exh. B. Both of his counselors have emphasized the sincerity of Arthur's efforts, describing his "genuine investment," "dedication," and "genuine and commendable" "desire to live responsibly." Ex. A; Ex. B. In his counselor's "clinical opinion, [Arthur] is making significant strides toward rehabilitation." Exh. B. Additionally, as detailed above, with Arthur' age, background, and engagement with treatment, Dr. Samenow indicates that Arthur presents a below average risk of reoffending. Exh. C at 21-23. *See also,* U.S. Sentencing Com'n, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Key Findings) (December 2017)[12], (finding "older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed").

Following his release from imprisonment, Arthur will be under federal supervision for years. He has abided by similar pretrial supervision conditions without issue for more than a year, earning, through his good behavior, a less-

---

[11] *Available at* https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p134-pub.pdf.

[12] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

restrictive curfew from Probation. *See* ECF No. 26 (granted, assented to motion to amend pretrial release conditions from "home detention" to "curfew"). He has worked and voluntarily participated in counseling. He has engaged in meaningful treatment for his PTSD and has taken stabilizing medications. Additional incarceration is unnecessary for public protection purposes as the public can be protected by "build[ing] upon the progress he has already made" in treatment and by the half-decade of post release monitoring that will follow his imprisonment. Accordingly, the low end of the range presented in the plea agreement meets the community protection goals of sentencing.

### D.     18 U.S.C. § 3553(a)(2)(D): Rehabilitation

Courts, the Department of Justice, and society writ-large have recognized that we owe our veterans a rehabilitative debt. Most obviously, unlike other Americans, veterans are afforded government-sponsored medical care for life through the VA. In the legal arena, there have also been efforts to provide a rehabilitative focus for veterans. *See* Judge Michael Daly Hawkins*, Coming Home: Accommodating the Special Needs of Military Veterans to the Criminal Justice System,* 7 Ohio State J. Crim L. 563, 569 (2010) ("There is widespread public acceptance of the notion that military veterans should be treated differently in many respects from their civilian counterparts. . . . This acceptance may be attributable to a general respect for the sacrifice of members of an all-volunteer force and the knowledge that today's veteran may have been subjected, even repeatedly subjected, to life-threatening events the general public may never know.").

To that end, there has been a significant expansion of Veterans Courts that seek to provide less punitive, more rehabilitative sanctions for military veterans. *See* Veterans Treatment Court Coordination Act, P.L. 116-153, § 2, 134 Stat. 688 (2020) ("It is the sense of Congress that veterans treatment courts are a successful program aimed at helping veterans charged with nonviolent crimes receive the help and the benefits for which the veterans are entitled."); 34 U.S.C. § 10651a (requiring "Attorney General shall establish and carry out a Veteran Treatment Court Program

to provide grants and technical assistance to court systems"); Dep't of Military Affairs and Veterans Services, *Justice Involved Veterans*[13], ("Six Veterans Tracks exist in New Hampshire courts today and serve to emphasize Veterans' military values and strive to hold participants accountable for their behavior while also encouraging the individual to engage in behavioral health treatment."). Although Veterans Court was not made available in this case, the factors that drove the development and financing of these alternative courts apply here. Arthur is a nonviolent veteran with no criminal history, suffering with service-related PTSD, and operating with limited social networks who would benefit from rehabilitative measures. As noted in his counselor's "clinical opinion, [Arthur] is making significant strides toward rehabilitation." Exh. B. There is no reason to suspect his rehabilitation will not continue.

## VII.    Conclusion

Upon consideration of all of the 3553(a) factors, and applying the parsimony principle, the defendant requests that the Court impose a sentence of 84 months in prison and five years of supervised release, consistent with the plea agreement.

Respectfully submitted,

Dated: February 27, 2026

*/s/ Eric Wolpin*
Eric Wolpin
N.H. Bar #18372
Assistant Federal Public Defender
Eric_Wolpin @fd.org


## CERTIFICATE OF SERVICE

I hereby certify that the above document was served electronically on February 27, 2026, upon all counsel of record through the electronic filing system.

*/s/ Eric Wolpin*
Eric Wolpin

---

[13] *Available at* https://www.dmavs.nh.gov/community-based-military-programs/councils-and-committees/justice-involved-veterans.